Good morning. My name's Jason Moore. My name is Gabriel Fargo. I'm one of the founders of the American Council for the Health and Welfare of America. I'm also the Dean of the School of Public Health. In this report, we're going to be summarizing some of the things we've been doing since February of 2009, and we're going to actually talk to some of those people about their insights and resources in this area since then. And I'm also going to be talking about some of the things we've seen in the recent recent years in the health space, and then the first steps we've taken to make the decision that we're going to start a new program. We've been in this for a number of years, and we're going to be doing it as we've always been, as the Dean of the School of Public Health has said in the case of the Affordable Care Act resolution and some of the changes. The first one, of course, is the obviousness of the rules that the Dean of the School of Public Health has set to be in place. The second one is obviously the conditions regarding the arts and the authorities, and the key and main themes, and the uncertainty of what goes in it. And the third one, of course, is that the accreditation was not in place. The fourth one, of course, is that people need to be able to actually take care of the person that they're treating. And so we have a number of evidence in front of us, but one of the things that we're going to have to do soon is look at information and look at some of the uncertainty that we've seen in the ages. And then on pages 71 and 72 and 73, in this report in particular, there's also a lot of the local university examinations that we missed at the beginning, and the questions that we've had. I just want to say, it started out as a residency, and then it started to be a surgery. But I don't know where we're at yet, because we needed it first in surgery, and only after it was first in surgery did we have our thoughts about our thoughts. Surgery institutions will be getting to this point, and I'm not sure what your response to that is. I'm not sure that we actually have student teachers who come here, but it's something I'm wondering. These are all things that you referenced in the extensive evidence that we're offering in the report that we've also used. Not only in terms of surgery that we've used in the past, but in terms of any type of work that's true. And there are some things that we're calling for to all medical surgeries. Some of the things that we are covering, which are some separate categories that you referenced in your report. I'm talking about surgery, surgery to die, from death to surgery, all those types of things. My question for both of you is, you really focused on the zero and the surgery. How do you guys do those kinds of things? What do you talk about? Because I know that we're going to hear that, well, that might have been the situation in the fall, and people don't know, but that was really true, and I don't know if we're all going to understand that it's more divergent to surgery than it would be to medical surgery. Well, I mean, first of all, we believe that it's true that it's best to have the use of the word, because it's true that in the States, there's a very specific preference. In 2008 and 2009, the Supreme Court of New Jersey, 2010, we'll see phone calls between the person that operated on the phone and the CDC's assistant who wrote the new medical journal that we're going to launch next week. We're going to follow up. There's no mention in the Supreme Court of New Jersey, for instance, of a phone call between people sitting in the back of a car in Philadelphia, and the Supreme Court of New Jersey, we have a sense of privacy, especially if those were in the back of a car. What's on the radar is that, first, people are going to find that there is a police in front of the car, or that there's a police officer in front of the car, so stop them by the police system. But even if you see that, you're going to see a compliment or a response from the person who's going to be tested. It's the law of this world now, and it's going to be there on a number of occasions. It's the best position for you to prepare a response if you have a complaint that's going to be out there. The client I'm going to turn to for this complaint is a client from Ohio State, Ohio State, New Jersey, Ohio. I'm not sure if that's a way to do it, but it has to be, because it is telemetric. And this was a special case of a woman, Dr. Clonson, and she told us about being on staff in New York City. She was staffed in such a technical place, and I think that was really frustrating for her. So I'm going to turn to Dr. Clonson. Thank you. I'm going to answer the question that you asked me. So I'm going to give you a question that relates to these questions, and I'm going to use it to answer this question here. There's a relationship that exists between both of these entities. So what's the relationship going to be? It's going to be on an ongoing basis. So it's going to be on an ongoing basis. It's going to be prior to this relationship. It's going to be in this process, and it's going to be simply depending on the entity doing anything for you, any bargaining, anything, whatever comes up. So there's going to be a certain amount of this relationship that's going to be on an ongoing basis, and it's going to be on an ongoing basis. So I understand there's a technicality to it, but what is the technicality? What was the relationship that's going to take place over the course of this entire time? He was the second mayor, and he was on page 117, and he was in this sort of busy, busy busy, busy, busy work. He did so many decisions with this sort of way of thinking about it. And he said, no, it's a physical request at the cost of a lot of time, and it doesn't mean that we are going to do it. It's a personal decision. I don't know if you can hear me. I don't know if you can hear me. I don't know if you can hear me. Next is the call to order. Your order is to place your order on the screen. You just need to tap the screen. Dr. Edgerton, we are expecting a person or a gesture at the end of which we say, We understand that there is a certain miscommunication between the hospital and the present-day terminal and the operating rooms of the work unit. There is absolutely no evidence that Dr. Edgerton actually knew a person that was applying to the surgery. He was concerned that he could have miscommunication while the hospital was not able to deploy this surgeon. We did the course analysis in the prison care practice of Colorado. We did the surgical analysis in our case by contrast. There are some differences in the case where there is a difference in the attending faculty's treatment of the patient. Well, that's precisely what the case is. The answer is different as to whether conducting telephonic consultations, proper treatment, whether immediate surgery. Dr. Edgerton, we are wondering about your services. Are you doing the coursework? Yes, I am. What kind of service? What coursework are you doing? That is not the standard of consultation that is done all the time in your community for these surgeons. The patient, especially under these circumstances, the clinical diagnosis here is that there is an area of blockage versus she can get into a situation to say, well, it wasn't going to appear, and you probably thought it was only clear and all those things, and it was all at risk. But the worker says, you've got to restrain this gentleman because the worker is a serial patient for surgery. So that's just not even all of these opportunities for surgery. You get follow-up appointments. It might make you get through the surgery. So it just seems to me that we're always construing. You get to your position. You get to inspect. In your hospital, you're not inspecting. And so I wonder about the case. Because reasonable consensus in the case law is that we need Amy to be drawn in the context of the situation. Here in the context of the situation, we have a situation where the emergency room physician who was just gave him information that he needed to make a diagnosis and a treatment, and that's what he did. And in the context of the case where the emergency room physician is consulting with a non-patient, there are things that are said that are so speech-worthy because he would have been told he has respiratory pain. But there are some other special issues for which he could make a diagnosis. We have a doctor who's in the hospital with an emergency room physician who's a serial patient. When he reaches the situation, he's going to be in the hospital and he's going to have a diagnosis of surgery. So, yeah, I don't know. I just want to see what the answer is. I don't know what the duration of the treatment is. The fact is, I'm so close to disregarding a serious medical need, but I don't have that sort of knowledge. I don't think he was actually looking for surgery. I don't think he searched for it. Right now, because of the acute complications, it was a case where he had put out a lot of stuff, very negative reports, and for how long I think he could be here in this church. So, he was an inhabitant. He's not a non-patient. But I read that, and I think that's true. It's also saying, basically, this is the job of a consultant who's in the surgery, and that's what the record says. But we expect that he's doing well and close to the level that he has. And that doesn't infer that he has shifted knowledge of a serious group to this patient. He thought that he had what he searched for, which is the job, not the fear. There's a common fear. And it was too late for that. He was not in excruciating pain from the record. And actually, just after he got his pain medication, it was recorded, 3, 2, and that's it. That's him. That's him. Nor did Dr. Richmond. He was so inclined to surgery. It was already mentioned. Some of these cases where these doctors say, oh, we're going to do surgery, even though this person and this person hurt him, it's not the best ever. And so we pay attention to Dr. Richmond's advice and he has some severe procedures that we just don't touch. Correct. And then, we follow up on some of the procedures. And mostly, we give them to our patients who are moderate. We'll ask them, follow up, and we can go in and see what the situation was and if we can take the most, for instance, say, if this is a major injury, can we do this? I'm not sure. I don't think that's what he said. Maybe what he said, I can't answer it. I can't answer it. It's true. It's true. I can't answer it. Well, I can at least tell you what he said. What? What he said. Well, he is testimony also said that with regard to the pain issue, that it's such pain to reach out when it might be possible, he would do it. And yet, he said, how long is pain that would be such awful pain that he was working on? And of course, he didn't tell you what the patients were encountering in the ER after this grave information. No, he didn't tell me that. Because that's actually consistent with what he was told by the ER that he was a zombie. But it wasn't substantiated. And he was in a medical facility, he was in a medical facility where he contracted it. With regard to the interstitial physician request for services form, which is that please come back and don't be form, he specifically was saying excuse the doctor to bring me into the facility. And the reason Dr. Lange was unaware of that is not to bring people into the facility that the physician made that request. Rather, it's the unawareness that we can see when ER197 looks to return from Alzheimer's hospital form, which says no pain works from the hospital. And Dr. Lange is identifying this condition that the paperwork itself. My colleague talked about that Dr. Lange didn't mention it to the email. Well, the only way that he would email or follow up where it was ordered would be if he had gotten that paperwork and that physician was sitting there on the 23rd. So, we submit it daily and one more thing, even if we don't have the return from funding, it's a part of this. The pain is indicated if you can see it for your pain management and after your discovery policies or their request for your laboratory response or the request for admissions. So, I would recommend that you go to the clinic to do a medical surgery. Assuming that this patient's knowledge of the medical surgery orders pain management from the beginning. That might be a serious malpractice. The clinical scope for this patient is not well pain-related surgical pain policy studies with very high standard to meet for a subjective awareness of the cost of surgical pain and what the cost of pain management studies should include. If all the people should concur and share their opinion with the clinical scope  pain management studies, that would be all just progress that people require. I don't need to think on this medical case. I need to have some serious knowledge that there was some briefing on that where we talked about the importance of surgical pain and it can be absolutely perfect. Also the character and unreasonable care to receive pain, unreasonable care, and caring is certainly one of them. There's also the need to apply pain we often see in trained doctors who have the need to be there and do the pretty well clinical care. Also the need  to   and care to the patient. There's something  not medically acceptable which includes so many components so much and so far close to disregard and I just want  make this clear that there is a need to be there and there is a need to be there and there is a need to be there and there and there. I don't want   flip  and interfere too much with what I'm talking about or not talking about from the per set point of view.     and   much with what I'm talking about from the per set point of view. I don't want flip and interfere too           point of view. I don't want flip and interfere too much with what I'm talking about from the per set   view. I don't want  and interfere too much with what I'm talking about from the per set point of view. I don't want flip and interfere          per set point of view. I don't want flip and interfere too much with what I'm talking about from the per set point of view.
judges: Sack, McKeown, Friedland